COMMONWEALTH of Kentucky,
Appellant

v.

Michael YOUNG and Janie
Young, Appellees

2013–SC–000367–DG

Supreme Court of Kentucky.

RENDERED: DECEMBER 17, 2015

MODIFIED: MAY 5, 2016

Rehearing Denied May 5, 2016

COUNSEL FOR APPELLANT: Jack Conway, Attorney General, William Bryan Jones, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, 1024 Capital Center Drive, Frankfort, Kentucky 40601; Perry Thomas Ryan, Assistant Attorney General, 1024 Capital Center Drive, Frankfort, Kentucky 40601.

COUNSEL FOR APPELLEE, MICHAEL YOUNG: Roy Alyette Durham II, Assistant Public Advocate, Department of Public Advocacy, 200 Fair Oaks Lane, Suite 500, Frankfort, Kentucky 40601.

COUNSEL FOR APPELLEE, JANIE YOUNG: Karen Shuff Maurer, Assistant Public Advocate, Department of Public Advocacy, 200 Fair Oaks Lane, Suite 500, Frankfort, Kentucky 40601.

## OPINION OF THE COURT BY JUSTICE NOBLE

This case presents the question whether biological parents who accept living expenses from two different sets of prospective adoptive parents without disclosing that fact may be charged with and convicted of theft by deception. It also presents the question whether the amounts paid by the two sets of prospective adoptive parents may be combined to elevate the theft, which would otherwise have been a Class D felony, above the $10,000 threshold to make it a Class C felony.

The biological parents in this case, Michael and Janie Young, raised the first issue to the trial court by moving to dismiss the indictment for failure to state a crime. The trial court denied the motion, and the Youngs entered guilty pleas conditioned on their right to appeal that decision. The Youngs never expressly raised the second question to the trial court, though they and the Commonwealth entered into stipulations of fact that touch on it.

The Court of Appeals reversed their convictions, holding that there was no theft by deception and thus no crime had been committed. The court held that the indictment should have been dismissed, and thus declined to address the second question as moot.

We agree with the trial court that the indictment in this case stated a public offense and therefore could not be dismissed. We reach the second question raised and conclude that the amounts may not be combined to elevate the level of the offense, and that this amounted to palpable error. We therefore reverse the Court of Appeals to the extent that it required the indictment to be dismissed, but we affirm to the extent that it vacated the Youngs' convictions.

## I. Background

The facts underlying the theft-by-deception charges in these two cases arise from an unusual situation that has received little appellate scrutiny but that must be examined first in order to give context to how the crime of theft by deception came to be charged, and the propriety of such a charge.

Janie Young became pregnant, her fifth known pregnancy. Michael and Janie had three sons they were raising. A fourth child had been born to them, but the Youngs had terminated their parental rights to that child by allowing the child to be adopted by Tracie and Jeff Scholen. No further details are known about that adoption. For whatever reason, Michael and Janie decided to look for a potential adoption placement for this fifth child.

Initially, the Youngs contacted Act of Love Adoptions of Boston, Massachusetts, in September 2009. They completed initial paperwork and thereafter received payments in various amounts totaling approximately $4,000 between October 2009 and February 2010 for prenatal expenses of the mother, Janie. As late as February 2010, Janie was sending documents to Act of Love necessary to lead to the adoption.

At some point, the Youngs also began discussing adoption of this child with Jeff Scholen. Since the Scholens had previous-

ly had a successful adoption with the Youngs, they also decided to potentially adopt this child, and began making prenatal expense payments to Janie in October 2009, providing her with $6002.99 in expenses, and paid $1,000 to the Youngs' attorney and $974 to their own attorney, through February 2010.

The Scholens were not aware that the Youngs had contacted another party about possible adoption of the child, nor that the Youngs had received money from that party until Janie left a voicemail message with Mrs. Scholen on February 24, 2010, telling her that she had made arrangements with another couple about adopting the child, but that if the Scholens repaid the money they could adopt the child. In a fifth voicemail message, Janie informed the Scholens that she had given birth to a girl, and that Michael therefore did not want to proceed with the adoption. Janie had apparently thought the child would be a boy, having told Act of Love that she was expecting a boy.

On March 9, 2010, Tracey Scholen reported these events to the Kentucky State Police. The Youngs were charged with theft by deception over $10,000, a Class C felony, and were later indicted by the Lawrence County grand jury.

The Youngs filed a motion to dismiss, arguing that the indictment failed to state a crime because the money they received from the Scholens was a gift, and if they received any money that was not a gift, such constituted an illegal transaction which the court could not "enforce."

The trial court conducted a hearing on the motion at which the Youngs' lawyer laid out the facts as alleged by the Commonwealth and argued that because there was no contract (and could be no contract) by which the expenses were paid so that the Scholens could adopt the child, there could be no theft. The trial court orally denied the motion, stating that the indictment was sufficient to state a public offense. The trial court later entered a written ruling that included "findings of stipulated fact" consisting of sixteen stipulations made by the parties, and "conclusions of law" stating that the money provided by the Scholens was a gift, but that the acts of the Youngs in failing to disclose "materially relevant information" to the Scholens were "substantial" and supported a prosecution for theft by deception.

The Youngs then entered into conditional pleas of guilty to theft by deception over $10,000. They reserved the right to appeal the denial of their motion to dismiss. They were both sentenced to five years' imprisonment, the minimum on a Class C felony, but the sentences were probated for five years.

They did appeal to the Court of Appeals, claiming that the indictment was faulty, as they had at the trial court, and for the first time that they were not properly convicted of theft of over $10,000 because they had only accepted about $6,000 from the Scholens. The Court of Appeals held that the charges should have been dismissed because "no crime occurred," and declined to reach the second issue because it was moot.

We granted discretionary review because of the uniqueness of the underlying actions that gave rise to the charge of theft by deception, and because the Court of Appeals appears to have been misled by this unique situation.

## II. Analysis

To fully understand why the Court of Appeals erred, it is necessary to first examine the setting from which this case derives, and then to apply the law regarding dismissal of indictments.

## A. The world of private consent adoptions

Whether it is a biological imperative or an emotional drive that is fostered by the society in which one lives, the Court can take judicial notice of the fact that most people have a *family* orientation, either as defining who they are, or how they live. And while it is true that in today's world, families take many forms, the most widely understood form is that of parent(s) and child, living together in a unit. This social structure provides context, support, and protection. Our artwork is rife with idealized images of mother and child, or the child interacting in some way with a parent. Our value system places a minimum decency standard on the way parents should treat their children, and holds the parent accountable that abuses or neglects his or her child. The world's religions focus on the strength of the family relationship and the duty of a parent to maintain the family as divinely required. Our laws, notably our tax laws, favor the family structure. Any list stating why family is important would include these and many other variables too numerous to mention.

At the heart of the concept of family is being a parent. The right to bear children, and to raise them, is so universal that only laws preventing abuse or neglect, proven by a very high standard, can void those rights. Our children are precious, and are *priceless,* as is reflected in the many state statutes, including KRS 199.590(2), which prohibit the *sale* of children. But not everyone can physically play a role in creating a child, or other circumstance can prevent it. To satisfy this inherent desire to be a parent and to have a family (an extremely strong motivator for many people), there is the remedy of adoption. And the people willing to adopt are often almost desperate to do so, which makes them particularly susceptible to deception and fraud.

Adoption has two principal benefits: adults who do not have children may obtain them, and children without parents may do likewise. From this, a host of other social, legal, and moral benefits follow. As a legal institution, few if any other processes can provide as many positive benefits to individuals and society as a whole.

And outside the ideal world, circumstances do arise that make children available to be placed with someone other than the persons who created them. There are enough childless couples or individuals in this country alone to make actually finding a child to adopt a competitive and expensive proposition: a domestic adoption can frequently cost around $40,000 and higher if the case is complicated. *See* Child Welfare Info. Gateway, U.S. Dep't of Health and Human Svcs., *Costs of Adopting* 2 (2011), *https://www.childwelfare.gov/ pubpdfs/s_costs.pdf.* These significant costs include professional fees (legal and medical), but one of the major components of these costs comes from the payment of living expenses to the expectant mother.

These expenses are allowed in 45 states, American Samoa, and the Northern Mariana Islands to at least some degree. *See* Child Welfare Info. Gateway, U.S. Dep't of Health and Human Svcs., *Regulation of Private Domestic Adoption Expenses* 2 (2013), *https://www.childwelfare.gov/pub PDFs/expenses.pdf.* Kentucky is among the most liberal of states in allowing living expenses to the expectant mother. KRS 199.590(6)(a) allows the prospective adoptive parents to pay "expenses of the biological parent or parents ... for any purpose related to the adoption," but does require that the court handling the adoption review an affidavit concerning the expenses, "for approval or modification."

Other states may impose more restrictions, but interestingly, it should be noted that almost all reviews of these living expenses are done *after payment.*

In Kentucky, this after-the-fact review by the court is not supplemented in the statute with any standards or guidelines for the court's review, or any penalties for improper payments, whatever the judge might think those were. As such, it smacks of closing the barn door after the horse has escaped. If there has been overpayment, there is likely no remedy for the prospective adoptive parent.

The procedure and requirements for all adoptions are governed by KRS 199.470-.590. The process of private adoption often comes through private agencies licensed by the state or attorneys with an adoption practice that connect expectant mothers with potential adoptive parents, or it may occur from direct initial contact between a birth mother and prospective adoptive parents, as it did in this case. However, when a child is placed with adoptive parents by a private person or an agency not licensed by the state, then written approval of the Secretary for Health and Family Services is required unless the adoption is to a relative specified in the statute. KRS 199. 470(3); 199.473(1). A private adoption does not necessarily exclude an adoption involving a child in foster care, but generally these arrangements are made before the child is born.

And adoptions of this nature proceed by consent of the natural parents. KRS 199.500. This consent must be "voluntary and informed." KRS 199.500(1). This consent can only be formalized at 72 hours after the birth of the child or later, and becomes final and irrevocable twenty days after execution of the voluntary and informed consent. KRS 199.500(5). This statute has great importance because it outright prohibits any private adoption by consent if the consent is obtained *prior* to 72 hours after the child's birth. The result is that an expectant mother cannot make a binding agreement to allow prospective adoptive parents to adopt her child before the child is born. Living expenses during pregnancy obviously arise during that time, and if prospective adoptive parents pay them, there is no guarantee that they will end up adopting the child. This prevents "selling" a baby, because the birth mother is not compelled to go forward with the adoption.

Nonetheless, KRS 199.590, which reiterates that no child may be purchased for any purpose, does at subsection 6 provide that certain payments can occur: fees for legal services, placement services and *expenses of the biological parent or parents.* These may be for "any purpose related to the adoption," nominally in the discretion of the trial court.

The difficulty arises because these expenses may be paid directly to the biological parents, and the only proof of payment comes from an affidavit listing the expenses the parents claimed. The statute does not provide for any kind of hearing on the matter, although such is inherently within the power of the court. There is no statutory requirement on the amount of detail to be included. And, by the time the court looks at this list, the expenses have already been paid and the money paid is long gone.

There are no checks and balances on how much money prospective adoptive parents can pay to the biological parent during the pregnancy. There is no method of verifying what actually was paid. This rudimentary accounting of the prepaid living expenses could actually be no more than a nod and a wink to the notion that a child has not been sold. And given that thousands of dollars are being spent in the *hope* that an adoption will occur,

prospective·adoptive parents are nonetheless given no recourse in the statutes. The view appears to be that if the prospective adoptive parent loses that money because the mother changes her mind, too bad; they knew the risk when they spent the money. But if the adoption occurs, then the money spent did not purchase a baby; the prospective adoptive parents merely helped ensure that they got to adopt a healthy baby. Our statute is woefully inadequate to address these problems. See Andrea B. Carroll, *Reregulating the Baby Market: A Call for A Ban on Payment of Birth–Mother Living Expenses*, 59 U. Kan. L.Rev. 285 (2011) (noting that the adoption expenses "scheme, under which substantial living expenses are paid to a prospective birth mother, who makes the ultimate choice to parent her child the vast majority of the time, is fraught with problems" (footnotes omitted)).

If there is fraudulent intent by the biological parents, or if they otherwise deceive the prospective adoptive parents, the biological parents have seldom been held accountable in any way. That is why this is a case of first impression in Kentucky. Indeed, only a few such cases have been prosecuted on this conduct at all.

One such case occurred in Oregon, and generated considerable media attention. The defendant, Maya–Anne Mays claimed to be pregnant by a soldier killed in Iraq, and approached three different couples who wanted to adopt her baby. *See* Carroll, *supra,* at 318 (citing various news accounts). She took living expenses from all three couples totaling over $13,000. *Id.* Then she claimed the baby was stillborn, so none of the couples were able to adopt. *Id.* Oregon officials doubted her story, and prosecuted her for devising a scheme to defraud the couples, a different charge from the theft charge in this case. *Id.*

Since she was unable to substantiate her pregnancy, she was convicted and sentenced to a three-year prison term. *Id.* Though legally markedly different from the charges in this case, the striking similarity of collecting living expenses from multiple prospective adoptive couples helps to point out how the legal framework for these private consent adoptions is inadequate to protect all parties to the transaction.

The private adoption process is thus fertile ground for inequities to occur, but can this situation also create criminal liability for deception?

## B. The Youngs were properly charged with theft by deception in the indictment.

The theft-by-deception indictment against the Youngs states that, alone or in complicity with each other, they "committed the offense of Theft by Deception Over $10,000.00 by knowingly and unlawfully engaging in a scheme to defraud Tracy and Jeff Scholan [sic] of money in excess of $10,000.00, by placing their unborn child for adoption to the Scholan Family and receiving from the Scholan family money for the upkeep of the mother during her pregnancy, without disclosing that they had placed the child for adoption through a second agency to another couple."

The theft-by-deception statute, KRS 514.040, begins by saying that there has been a theft by deception when a person intentionally obtains property from another by deception. It goes on to say that a person "deceives" by, among other things, (1) intentionally creating or reinforcing a false impression or (2) intentionally preventing another from acquiring information that would affect his judgment about a transaction. KRS 514.040(1). If the victim's property is obtained in this manner, then there has been a theft under

the statute even if the victim willingly complied in giving up the property, because he or she was deceived into doing so.

It is important to emphasize here that the Youngs are arguing that this case should have been dismissed because the indictment did not charge a crime.

██ There are very few grounds upon which a trial court can dismiss an indictment. Indeed, they are "usually related to a defendant's claim of a denial of the right to a speedy trial," *Hoskins v. Maricle*, 150 S.W.3d 1, 13 (Ky.2004), which is not at issue here. The general rule is that "[a]n indictment returned by a legally constituted and unbiased grand jury ... *if valid on its face*, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (emphasis added). And our own rule is that absent circumstances constituting one of the "rare exceptions, ... a trial judge has no authority, absent consent of the Commonwealth's attorney, to dismiss, amend, or file away before trial a prosecution based on a *good indictment*." *Hoskins*, 150 S.W.3d at 13 (emphasis added). Outside of the rare exceptions, a facially valid indictment is properly triable: "the proper time for the trial court to consider evidentiary sufficiency is after the evidence has been heard and upon a motion for directed verdict." *Commonwealth v. Allen*, 980 S.W.2d 278, 281 (Ky.1998).

██ Of course, the important point here is that the indictment must be valid on its face to avoid dismissal, though that is a low bar, *see Thomas v. Commonwealth*, 931 S.W.2d 446, 450 (Ky.1996) (noting that under modern Criminal Rules, an indictment need only give "notice of the specific crime charged" to be valid); *see also* RCr 6.12 ("An indictment, information, complaint or citation shall not be deemed invalid, nor shall the trial, judgment or other proceedings thereon be stayed, arrested or in any manner affected by reason of a defect or imperfection that does not tend to prejudice the substantial rights of the defendant on the merits."). Failing to state a public offense on the face of the indictment may be one of the rare instances that will justify dismissal. *Cf. Taulbee v. Commonwealth*, 465 S.W.2d 51, 52 (Ky. 1971) ("The trial court committed no error in overruling the motion to dismiss the indictment, for the indictment did state a public offense."). But there is no such failure here.

The indictment alleges that the Scholens were deceived into paying Janie's living expenses during the pregnancy because they were deceived about being the *only* family seeking to adopt the child soon to be born. If that statement is true, then the Scholens' property was indeed obtained by deception, if being the *only* family in the running to adopt the child mattered enough to them that knowledge that there was a competitor would have kept them from paying the living expenses. The significant point is that this is a question for the jury, not one the trial court has any authority to answer on a motion to dismiss.

The legal question in this case, premised on denial of a motion to dismiss, has nothing to do with whether the Youngs had any obligation to allow the Scholens to adopt their baby because they had taken living expenses from the Scholens. There was clearly no such obligation, and the trial court was correct in his finding on that question, although it is immaterial to the relevant legal question. The trial court, more importantly, found the indictment stated a sufficient charge of theft by deception based on the allegations alone.

The simple legal question before us is whether the trial court was correct in finding that the Commonwealth stated enough

in the indictment to proceed to trial. The trial court was correct.

The Commonwealth was not required to *prove* any of its allegations at that early stage of the case, although the Commonwealth was obviously required to proceed on the indictment in good faith. There were facts it knew (and that indeed the parties later stipulated to) that created a question whether the Scholens had actually been deceived, resulting in the loss of the property from paying Janie's living expenses during the pregnancy. With such a question, this indictment could not be dismissed. The trial court clearly understood exactly what the legal posture of the case was, because even though he denied the motion to dismiss, he noted that a trial might prove otherwise.

The Youngs have come at this case not as simply a procedural matter, but as something equivalent to a summary judgment. They simply asked the trial court to dismiss the case as a matter of law because the expense money paid to Janie was a gift, and because the Scholens, if they did not mean the money to be a gift, were trying to buy a baby. The law does not allow the sale of babies, they reasoned, and therefore the money had to be a gift, and there could be no crime. This circular reasoning obviously takes no account of the fact that the Scholens do not agree that the money was a gift, but was instead obtained by deceptive means. Even if this were a civil claim subject to summary judgment, one could not be granted over this dispute of fact.

And as a criminal charge, the apparent "gift" nature of the living expenses does not prevent obtaining them by deception, which is a theft under the statute. All of the circumstances of this case, whether stipulated facts or not, are appropriate for a jury to consider in determining whether there was a theft, and the Commonwealth was entitled to that consideration.

Thus, this Court concludes that the trial court acted correctly in denying the Youngs' motion to dismiss the indictment. The Commonwealth was entitled to proceed before a jury and present its proof.

**C. The Youngs were not properly convicted of Class C theft.**

■ This case, however, has been complicated by the fact that the Youngs entered into a conditional guilty plea as charged. The sole issue raised by that plea is that the indictment should have been dismissed. We have clarified that it was not appropriate to dismiss the indictment at that point. Procedurally, this leaves the Youngs having pleaded guilty to theft by deception over $10,000, a Class C felony.

But the Youngs argue on appeal that they could not properly be charged with theft by deception *over $10,000*, because they received less than $10,000 from the Scholens. Theft by deception is only a Class D felony when the amount stolen is between $500 and $10,000. KRS 514.040(8). The Youngs claim that it was improper to add the funds paid by Act of Love to reach the $10,000 amount. The latter part of this argument is correct.

As the trial court found in its order denying the motion to dismiss (which was jointly prepared by the Commonwealth's Attorney and defense counsel and submitted to the court), the parties had stipulated that less than $10,000 came from the Scholens. The extra money bringing the total up to $10,000 came from Act of Love. Act of Love is not listed as a victim in the indictment, and even had it been, the theft from Act of Love cannot be added to the theft from the Scholens to exceed the Class D felony limit and make the theft a Class C felony.

■ Admittedly, it has long been the law that separate thefts from a single victim can be aggregated, under the right circumstances. *See, e.g., Weaver v. Commonwealth*, 86 S.W. 551, 552 (Ky.1905) ("[I]f the articles were taken ... as the result of a single purpose or impulse, though the asportation was at intervals to better suit his convenience, the degree of the offense will not be lessened by the fact that he could not or did not carry away all the articles at one load. But if appellant took at one time certain articles of less aggregate value than $20, and later determined to take and did take others also of less value than $20, but altogether being of the value of $20 or more, nevertheless the two larcenies cannot be added together so as to sustain the charge of grand larceny."). And this Court has never expressly addressed whether property stolen from different victims at different times and places can be aggregated into a single charge. But reason and logic compel the conclusion that separate thefts against multiple victims at different times and locations cannot be aggregated to elevate the degree of a single theft charge.

At the very least, this Court "has long held that a single act which affects multiple victims constitutes multiple criminal offenses." *Smith v. Commonwealth*, 734 S.W.2d 437, 447 (Ky.1987). Thus, even if the Youngs' alleged deception could be construed as one overarching act, it affected multiple victims and thus gave rise to separate crimes. With respect to the crime of receiving stolen property, which is similar to the theft statutes in that it addresses "property of another," this Court has stated expressly that having "a separate count for each owner ... was totally correct." *Hensley v. Commonwealth*, 655 S.W.2d 471, 472 (Ky.1983). In that case, property had been stolen from four separate owners, and four separate charges were brought.

■ We think the same reasoning applies to the theft statutes. "The nature of the transaction must determine whether the offense was one, or whether it was a series of offenses." *Weaver*, 86 S.W. at 552. Prosecutors do not have discretion to add the thefts together to arrive at a higher level of offense. They must instead charge discrete offenses. This Court concludes that thefts from different victims give rise to separate offenses and cannot be aggregated.

■ The problem, however, is that this argument was not raised directly to the trial court. The Youngs argue that their motion to dismiss inherently included this argument. But a motion to dismiss an indictment is different than a request that the charge be limited to a Class D version of that offense. And even if the Youngs had raised this issue to the trial court by claiming that the Commonwealth could not prove the money from the Scholens exceeded $10,000, they would have had to wait until trial to prove differently. Nothing on the face of the indictment indicates that the aggregate amount came from more than one source. Even if the Youngs had moved to amend the indictment and limit the charge, they would have been unsuccessful if the Commonwealth had opposed their motion. As with dismissal of an indictment, amendment of the indictment requires the Commonwealth's consent. *Hoskins*, 150 S.W.3d at 13. Thus the trial court was correct in not dismissing the indictment based on the amount stated therein alone.

But in an apparent burst of creativity and agreement, and possibly being focused on the Youngs' claim that no crime had been committed, the parties agreed during plea negotiations to a set of stipulated facts, which were later incorporated into the court's written order denying the mo-

tion to dismiss. The Youngs wanted to appeal the denial of the motion to dismiss. Perhaps the Commonwealth wanted to avoid going through a trial on a delicate subject. For whatever reason, the Commonwealth agreed to a conditional guilty plea that allowed an appeal from denial of the motion to dismiss and the Youngs agreed to otherwise plead guilty to the indictment as charged.

The record reflects that this argument—that the Youngs could not be prosecuted for Class C felony theft—was not made, however, until the case was at the Court of Appeals. That court did not address the argument, because it found that the indictment stated *no* crime and thus dismissal was appropriate. This argument has again been made before this Court. But it was never made to the trial court, and thus was not preserved for ordinary review. Nor have we been asked to consider the matter as palpable error, probably because the Youngs believe the argument is subsumed in their motion to dismiss.

That leaves this Court with one option of finding that the Youngs, having pleaded guilty as charged in the indictment without asking the Commonwealth to amend the indictment to reflect the stipulated proof, are stuck with the felony they pleaded to, and leaving them to address the matter through a collateral attack.

But that may not have been the intent of the parties. By entering into various factual stipulations, it appears that the Commonwealth and the Youngs, at least, had some discussions about how the $10,000 figure necessary for a Class C felony charge was determined. They identified that as an area of contention by specifying the amounts paid separately by the Scholens and Act of Love. But it is unclear whether the Commonwealth erroneously believed that the two amounts could be "stacked" to reach the $10,000 amount, or

whether the defendants were insisting that they could not, because that was not articulated to the trial court or at any other place in the record. On appeal, the defendants did clarify their position, but they should have been aware of this issue while the matter was still at the trial court, because the court repeatedly told the Youngs at their sentencing that they were pleading to a Class C felony, with a sentence range of five to ten years.

Thus we are left with an unpreserved error that was not argued to the trial court. And this court has often said we will not review a claim of error not argued to the trial court. *E.g., Kennedy v. Commonwealth,* 544 S.W.2d 219, 222 (Ky.1976), *overruled on other grounds by Wilburn v. Commonwealth,* 312 S.W.3d 321 (Ky.2010) ("[A]ppellants will not be permitted to feed one can of worms to the trial judge and another to the appellate court."). Generally, this involves instances when one legal theory was presented to the trial court, and a different one is being argued on appeal. The long view behind these decisions is that a trial court should not be found to have acted in error on a ground that was never presented to the court.

■ But even this rule is not without exception. A reviewing court may reach a palpable error, regardless of the grounds argued to the trial court. *See Fischer v. Fischer,* 348 S.W.3d 582, 589 (Ky.2011), as modified (Sept. 20, 2011) (noting that palpable error is an exception to the can-of-worms rule). The difference is that palpable error carries a very high standard of review. It requires the reviewing court to find that the error created a "manifest injustice." RCr 10.26. We have described manifest injustice as "a repugnant and intolerable outcome." *McCleery v. Commonwealth,* 410 S.W.3d 597, 606 (Ky.2013). We have described this as a "probability of a different result or error so fundamental

as to threaten a defendant's entitlement to due process of law," *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky.2006), and an error that is "shocking or jurisprudentially intolerable," *id.* at 4. That is clearly the case here.

Had the proper legal argument been placed before the court, there can be little doubt that this error could have been avoided. Either the indictment could have been properly amended, with the Youngs pleading guilty to a proper charge, or the trial court could have refused to accept their guilty pleas to an offense they could not, as a matter of law, have committed. And if it were not, then the issue would be squarely framed for appeal, and a simple reversal would be in order, because the Youngs would not have entered pleas to an improper charge based on the facts stipulated by the Commonwealth.

This practice has presented an unusual procedural posture to this Court that requires setting aside the Youngs' convictions, even though the trial court properly refused to dismiss the indictment. Had we been able to affirm based on that decision alone, this case would be over. But because the Youngs entered pleas in clear contravention of the stipulated facts of the case, based on an apparent mistake in the law or oversight of the parties, this Court must also correct that palpable error by setting aside the convictions and remanding to the trial court for any further proceedings the Commonwealth may wish to pursue.

## III. Conclusion

Based on the reasons set forth above, the Court of Appeals is reversed, and the decision of the Lawrence Circuit Court

denying the motion to dismiss is affirmed. The Court of Appeals is affirmed, however, to the extent that it set aside the Youngs' convictions. Those convictions are set aside on grounds of palpable error creating a manifest injustice, and the case is remanded for further proceedings consistent with this opinion.

Minton, C.J.; Cunningham, Hughes, Keller, Noble, Venters and Wright, JJ., sitting. Minton, C.J.; Cunningham and Hughes, JJ., concur. Keller, J., concurs by separate opinion in which Venters and Wright, JJ., join.

## KELLER, J., CONCURRING:

I concur with the majority that the Youngs' convictions must be set aside. As the majority notes, the Youngs were charged with defrauding the Scholens "of money in excess of $10,000.00" when the parties stipulated that the Scholens had paid the Youngs less than $10,000.00. Therefore, the indictment for and plea of guilty to a Class C felony were inappropriate.

I note a further defect with the indictment. As the majority states, the Youngs were indicted for "placing their unborn child for adoption to the Scholan [sic] Family and receiving from the Scholan [sic] family money for the upkeep of the mother during her pregnancy, without disclosing that they had placed the child for adoption through a second agency to another couple." Because a birth mother cannot validly consent to an adoption until 72 hours after giving birth, I fail to see how the Youngs could have *placed* their unborn daughter for adoption at the point in time the indictment alleges.[1] What the Youngs

1. The term "placed for adoption" is not defined in KRS 199.011. However, "placement services" is defined and refers to "the arrangement and placement of children in ...

adoptive homes." Thus, the implication is that "placed for adoption" is in some way related to the physical transfer of a child from the birth parents to the adoptive parents. *See*

allegedly did was take money from two different parties while leading both to believe that, if the Youngs agreed to go through with an adoption, each party would be first in line to adopt. That being noted, the trial court did not abuse its discretion when it denied the motion to dismiss the indictment. The parties knew what actions by the Youngs were at issue and the preceding defect in the indictment did not "prejudice the substantial rights of the [Youngs] on the merits." RCr 6.12. In the event the Commonwealth chooses to pursue any similarly-based proceedings in the future, it should carefully craft any indictment to better comport with our current statutes involving termination of parental rights and placement of children for adoption.

While I do not necessarily disagree with the *dicta* in the majority opinion regarding the definition of family, the importance of family, and the role of adoption in society, I fail to see how that *dicta* is necessary or constructive. In particular, I note that the majority states that one of the principal benefits of adoption is for "children without parents" to obtain parents. Clearly, that does not apply here because this child has parents, the Youngs, who chose not to go forward with the adoption, as was their right.

> *Matter of Appeal in Gila Cnty. Juvenile Action No. 3824*, 124 Ariz. 69, 71, 601 P.2d 1353 (Ct.App.1979)("There must be some readily ascertainable event, upon which adoptive parents can be secure in the knowledge that the child in their home cannot be taken from them solely at the whim of the natural parents.... [T]hat event is when the child is first placed in the adoptive home.") While I would not necessarily go so far as to say that placement cannot occur until physical transfer of a child takes place, I do not believe that placement can occur before valid consent is obtained. *See Matter of Adoption of Male Child*, 73 Haw. 314, 318, 832 P.2d 265, 268 (1992) ("[P]lacement is the culmination of a process" beginning with valid consent.)

Furthermore, I find the majority's discussion of the adequacy of Kentucky's adoption statutes is, at best, misleading. The majority states that: "there is likely no remedy for the prospective adoptive parent" who has paid the living expenses of the birth parent or parents when the adoption fails to go through; "[t]here is no method of verifying what actually was paid;" and "prospective adoptive parents are ... given no recourse in the statutes." I do not necessarily disagree with the majority that there is little recourse for prospective adoptive parents when a biological parent or parents do not go through with a contemplated adoption.[2] However, that is not the issue in this case. The issue in this case is whether the Youngs *fraudulently* obtained money from the Scholens by withholding crucial information from the Scholens sufficient to support criminal charges. Under the majority opinion, whether the Youngs proceeded with the adoption is irrelevant because the Youngs' actions took place before they could have legally consented to the adoption. Therefore, even if the Youngs had consented to the adoption, under the majority opinion, the Youngs could have been indicted for theft by deception.[3]

I point out the preceding to emphasize for the bench and bar what this case is not

**2.** KRS 199.590(6) does provide for oversight by the court; however, a petition for adoption can be filed, at the earliest, "at the time of placement." KRS 199.470. Therefore, if the birth parent or parents refuse to consent to the adoption, there will be no adoption proceeding and no court oversight.

**3.** I recognize that, if the Youngs had gone forward with the adoption with the Scholens the Commonwealth would likely not have sought an indictment because Acts of Love Adoptions appears to have been unwilling to pursue the matter.

about. It is not about birth parents who lawfully accept living expenses from prospective adoptive parents and then do not go forward with the adoption after a child has been born. Birth parents have the absolute statutory right to refuse to go forward with an adoption, a right that is not curtailed or criminalized by the lawful acceptance of living expenses.

Furthermore, as noted above, while prospective adoptive parents have limited recourse for recouping expenses paid when the adoption of a newborn infant falls through, that is one of the risks involved in our adoptive process for newborns. There are many children in the Commonwealth in foster and institutional care who are waiting for and would greatly benefit from adoption. These children require and deserve loving parents no less than newborns. However, these children are often afflicted, through no fault of their own, with physical and emotional problems, which can present significant challenges for their adoptive parents. It is because of these potential problems that prospective adoptive parents are willing to take the financial risks associated with the process outlined in our statutes to adopt a newborn. I note that such adoptions also carry risks in addition to the financial ones at issue here. During birth anything can happen, and the gift of life that a baby is may also present significant challenges due to any number of physical infirmities or genetic defects. In such sad cases, the prospective adoptive parents could not be forced to go forward with the adoption, just as the birth parents cannot be forced to relinquish their parental rights to their child.

In closing, the adoptive process for newborns in Kentucky can be filled with both joy and sorrow. However, it remains a reasonable solution to one of life's most difficult dilemmas, and I write to clarify what should and should not be inferred from the majority's opinion and to warn against the potential chilling effect the prosecution of birth parents may have on the process. While KRS 514.040 (our theft by deception statute) is very broad indeed, I advise our Commonwealth's capable prosecutors to exercise the utmost caution and discretion in determining whether to prosecute birth parents under this statute.

Venters and Wright, JJ., join.